Michael J. GILL, Plaintiff,

v.

DELAWARE PARK, LLC, Sam Abbey, individually and in his official capacity as Racing Secretary for Delaware Park, William Rickman, Allen Iwinksi, and Scott Lake Defendants.

No. CIV.03–436–SLR.

United States District Court,
D. Delaware.

Dec. 2, 2003.

C. Malcolm Cochran, IV, Esquire and David A. Felice, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for the Plaintiff. Of Counsel: Alexander J. Walker, Jr., Esquire and Daniel E. Will, Esquire of Devine, Millimet & Branch, P.A., Manchester, New Hampshire.

James F. Burnett, Esquire, W. Harding Drane, Jr., Esquire and Timonth Michael Holly, Esquire of Potter, Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants Delaware Park, LLC, Sam Abbey and William Rickman.

Joseph A. Gabay, Esquire and Neil R. Lapinkski, Esquire of Swartz Campbell LLC, Wilmington, Delaware. Counsel for Defendants Allen Iwinksi and Scott Lake.

## MEMORANDUM OPINION

Sue L. ROBINSON, Chief Judge.

### I. INTRODUCTION

This action was filed on April 30, 2003, and involves allegations of both federal statutory claims and state law claims sounding in tort. (D.I.1) The court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331–32. Presently before the court are the following motions: (1) motion by defendants Delaware Park, LLC, Sam Abbey, and William Rickman to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted (D.I.9); (2) motion by defendant Scott Lake to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted (D.I.21); and (3) motion by defendant Allen Iwinksi to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.[1] (D.I.23) For the reasons stated below, the court grants in part and denies in part the motions by the defendants.

### II. BACKGROUND

Plaintiff Michael Gill is an owner of approximately 270 thoroughbred horses, the largest volume held by any owner in the country. Plaintiff has grown quite successful in this sport, having 643 starts as of April 28, 2003, earning 142 first place finishes, 97 second place finishes, and 93 third place finishes. (D.I.1) As of the commencement of this action, plaintiff had already realized over $2 million in purse

---

1. Although three separate motions were filed in this case, they raise identical issues. Defendants Delaware Park, Rickman and Abbey at this stage have elected to be represented by the same counsel, as have defendants Iwinksi and Lake.

money for his horses' successes in 2003. In 2002, plaintiff was the second leading horse owner in the country, in terms of both races won and purses earned.

Defendant Delaware Park, LLC owns and operates Delaware Park, a horse racing track venue, licensed by the State of Delaware as both a thoroughbred racing track and a video lottery agent. In Delaware, horse racing is regulated and governed by the Delaware Thoroughbred Racing Commission ("Commission") which is part of Delaware's Department of Agriculture. The Commission promulgates rules, the Delaware Rules of Racing, which govern the thoroughbred racing industry in Delaware. (D.I.1, ¶ 12–13)

Abbey is the Delaware Park Racing Secretary. The position of racing secretary is defined by the Delaware Racing Rules and includes the responsibility of programming races during the race meeting, compiling and publishing condition books, assigning weights for handicap races, and receiving all entries, subscriptions, declarations, and scratches. (*Id.*, ¶ 17) The racing secretary is also responsible for the assignment of stalls. The racing secretary is appointed by the licensee, in this case Delaware Park, with the prior approval of the Commission. Abbey's salary is paid by Delaware Park.

Rickman is an owner of thoroughbred racing horses that compete at Delaware Park. He is also a member of Delaware Park, LLC. Iwinski and Lake are horse trainers that race thoroughbred horses at Delaware Park.

Each year, Delaware Park hosts a "meet" which is a series of races held over a period of time. In 2003, the Delaware Park meet lasted from April 26 through November 9. Horse racing venues, such as Delaware Park, offer stall space to horse owners and trainers. The stalls allow an owner or trainer to quarter their horses conveniently at the track during a meet.

These stalls are generally provided free of charge, upon application of either an owner or trainer. In 2000, 2001, and 2002, plaintiff had been awarded 45 stalls at Delaware Park.

In the sport of horse racing, there are several types of races. One type is known as a claiming race. In a claiming race, a horse owner must declare in advance of the race a price at which his horse will be offered for sale. At Delaware Park, any horse owner that has a valid or current Delaware license may purchase a horse competing in a claiming race. If a person offers the listed price for the horse in advance of the race, that person gains legal title to the horse at the race's completion. Any prize money obtained in that race, however, is retained by the previous owner. The purpose of claiming races is to insure that horse races are competitive, and that horses of similar ability compete against each other. An owner who undervalues his horse risks losing ownership of that horse to another owner.

Many owners and trainers observe a tradition that, despite their legal right to do so, they will not claim another owner's or trainer's horse. Express agreements to that effect, however, are a violation of Delaware Rules of Racing. Plaintiff does not observe that tradition and aggressively employs the use of claiming as part of his overall racing strategy. (D.I.1, ¶¶ 36–40) Plaintiff admits that his claiming tactics have not been warmly received by other owners. (*Id.*, ¶ 41)

In 2002, plaintiff's aggressive claiming strategy aided him in having a very successful year. In 2002, plaintiff was the leading owner at the Delaware Park meet, as his horses placed first 85 times, second 93 times, and third 80 times out of 592 starts. As a result, plaintiff earned $2,695,484 in purse money, which was

$2,223,681 more than the next highest owner.

Plaintiff alleges that this success resulted in several angry encounters with owners and officials at Delaware Park. According to plaintiff, Abbey threatened him and his trainer that if plaintiff were to continue his claiming tactics, Abbey would prevent plaintiff from participating in future races at the venue. At one point, Abbey also stated that he had contacted racing secretaries at other racing venues and told them that they should not permit plaintiff to race his horses at their tracks.

Plaintiff alleges that Rickman had conversations with trainers in which plaintiff was disparaged, and Rickman allegedly stated that he would seek to prevent plaintiff from future Delaware Park meets. Plaintiff alleges that Iwinski and Lake had complained that plaintiff " 'claimed too many horses.' " (D.I.1, ¶ 48) Plaintiff further alleges that defendants Iwinksi and Lake threatened to not race their horses at the Delaware Park 2003 meet, if plaintiff were permitted to race his horses. (Id., ¶ 46)

On February 8, 2003, an article written by Andrew Beyer was published in the Washington Post entitled "Gill's Claim To Fame." That article discussed plaintiff's claiming strategies and the reputation he had developed among horse owners and trainers. Plaintiff is quoted as saying that Abbey told him "if you claim [Pino's horse] you're out of here!" (Id., ¶ 78) Abbey is quoted in the article as calling plaintiff a "liar", in response to plaintiff's accusation. (Id.)

On February 14, 2003, plaintiff's trainer Mark Shuman filed an application for stalls for the 2003 Delaware Park meet. Plaintiff also purchased a training facility near Delaware Park in the event that he was denied stalls.

On March 25, 2003, Delaware Park, through its Chief Operating Officer William Fasy, denied Shuman's application for stalls. Additionally, Fasy informed Shuman that "effective immediately, you are not welcome on the grounds at Delaware Park, and Delaware Park will not accept entries for horses owned or trained by you." (D.I.1, ¶ 71) On March 27, 2003, plaintiff received a similar letter from Fasy stating that "effective immediately, you are not welcome on the grounds of Delaware Park and Delaware Park will not accept entries for horses owned by you." (Id., ¶ 72) Delaware Park's stated reason for excluding plaintiff was negative publicity and controversy surrounding plaintiff.

In count I of the complaint, plaintiff alleges that the conduct of each of the defendants violated the Sherman Antitrust Act, 15 U.S.C. § 1. In count II, plaintiff alleges that Delaware Park and Abbey acted under color of law and deprived him of due process in violation of 42 U.S.C. § 1983. In count III, plaintiff alleges that each of the defendants tortiously interfered with plaintiff's contract and advantageous business relationship. In count IV, plaintiff alleges that defendant Abbey committed defamation by negligently causing to be published false and professionally disparaging statements in the Washington Post.

## III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, defendants' motions to dismiss shall be treated as motions for summary judgment. See Fed. R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden

of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Violations of the Sherman Act

■ Plaintiff argues that defendants' conduct violates § 1 of the Sherman Act which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (2002). Consequently, there are three elements which a plaintiff must allege: (1) a contract, combination or conspiracy; (2) a restraint on trade; and (3) an effect on interstate commerce. *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hosp.*, 185 F.3d 154, 157 (3d Cir.1999).

Defendants allege that plaintiff's complaint is defective on two basis. First, that the complaint fails to properly plead an effect on interstate commerce. Second, that it fails to assert conduct that under either per se analysis or rule of reason analysis, amounts to a restraint on trade.

■ A plaintiff alleging a claim under the Sherman Act must allege not simply injury, but antitrust injury that is causally related to the defendants' alleged illegal anti-competitive behavior. *Eichorn v. AT & T Corp.*, 248 F.3d 131, 138 (3d Cir.2001). Once there is a finding of anti-trust injury, the court will then analyze the conduct of the defendants under either the per se test or the rule of reason test. *Id.* "Under the per se test, 'agreements whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality' are found to be antitrust violations." *Id.* (quoting *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). In circumstances where the per se test is not applicable, the court will then apply the rule of reason test under which plaintiff has the burden of proving that the defendants' conduct "under all the circumstances ... [is] unreasonably restrictive of competitive conditions in the relevant market." *Id.* (quotation omitted).

In count I, plaintiff alleges that the conduct of the defendants "restrain[ed] and dilut[ed] competition in the horseracing industry in the United States and at Delaware Park." (D.I.1, ¶ 85) The antitrust injury requirement, however, "cannot be met by broad allegations of harm to the 'market' as an abstract entity." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 n. 8, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Nonetheless, the Third Circuit has held that the anti-trust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market. *See Fuentes v. South Hills Cardiology*, 946 F.2d 196, 202 (3d Cir.1991). In the present case, plaintiff alleges, in addition to pecuniary harm of a personal nature, that the market for competitive thoroughbred racing was injured both nationally and in Delaware by preventing a substantial competitor from participating at Delaware Park. Proving harm to the market is an intensive factual consideration which this court is reluctant to consider at this stage in the litigation.

Defendants argue that plaintiff has failed to allege conduct by the defendants which rises to the level of a restraint on trade under either a per se analysis or rule of reason analysis. Plaintiff responds that under either analysis, he has sufficiently stated a claim for relief. Plaintiff alleges that defendants engaged in a "group boycott" and in a "vertical restraint on trade" by which he was categorically denied access to thoroughbred competitions at Delaware Park. (D.I.1, ¶ 83) Defendants respond that since Delaware Park has the exclusive right to exclude plaintiff from the venue, that this conduct can not be anticompetitive. Delaware Park's argument falls short. Assuming arguendo plaintiff's allegations, it is irrelevant if Delaware Park had the right to exclude, if the reason to exclude plaintiff was to further an object proscribed by the Sherman Act, namely, to reduce or eliminate competition. It would be a vertical restraint on trade if Rickman used his control over the market for thoroughbred racing meets in Delaware, via his ownership interest in Delaware Park LLC, to prevent plaintiff from competing against Rickman in the Delaware thoroughbred racing market. Similarly, to the extent the other defendants participated and conspired to assist in this impermissible objective, their conduct may be similarly actionable.

At this stage in the litigation, the court concludes that resolution of the issue of which rule of analysis must be applied is premature, as there are genuine issues of material fact as to whether defendants' conduct constituted an illegal restraint on trade and whether an injury satisfying the statutory standard occurred.[2]

### B. Violation of § 1983

Plaintiff alleges that Abbey, as Racing Secretary, is a state actor and that Abbey and Delaware Park, under color of state law, have deprived plaintiff of a right secured under the Constitution or by federal law by denying him access to the venue without due process of law. *See* 42 U.S.C. § 1983 (2002). Defendants contends that Abbey is not a state actor and, therefore, no claim exists under § 1983.

Given Third Circuit precedent in this area, plaintiff bears a prodigious burden to demonstrate that Abbey is, in fact, a state actor. *See Crissman v. Dover Downs Entertainment Inc.*, 289 F.3d 231 (3d Cir.2002); *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3d Cir.

---

**2.** Whether defendants' conduct is of the quality to require per se analysis or rule of reason analysis, is a question best resolved after the completion of discovery.

1979). Nonetheless, it is not clear at this point in the litigation that the matter is resolvable as a matter of law. As the determination of whether a particular party was a state actor for purposes of § 1983 is a question of fact, the court declines to dismiss on that basis.

## C. Tortious Interference with Contract and Tortious Interference with an Advantageous Business Relationship

The torts of interference with an existing contract and interference with advantageous business relations are closely related and derived from common law proscriptions against restraints of trade. "Such rule has its origins in the refusal of the common law courts of England to enforce restrictive covenants not to compete ... such principle being later applied to prevent interference with existing contracts... and still later to interference with prospective contracts or business opportunities." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del.Ch.1980). The principal distinctions between the two causes of action are that in the latter, there is a "privilege to interfere within the limits of fair competition with prospective business opportunities." *Id.*

### 1. Tortious Interference with Contract

■ Under Delaware law, a claim for tortious interference with a contract has five elements: (1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury. *See Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del.Ch. 1987). As to this claim, plaintiff's complaint is defective on its face as it fails to allege the existence of a valid contract.

### 2. Tortious Interference with Advantageous Business Relationship

■ The tort of interference with prospective business relationships in Delaware requires the following elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted. *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 5 F.Supp.2d 238, 243 (D.Del.1998).

Plaintiff alleges that the defendants tortiously interfered with both his business relationship with Delaware Park, as well as with other race tracks, including Philadelphia Park, Aqueduct and Belmont. Plaintiff alleges that defendants' conduct caused the severance of all relations with Delaware Park and the refusal of Philadelphia Park, Aqueduct, and Belmont to grant him stall space for the 2003 racing seasons. Plaintiff alleges the existence of such an interest at Delaware Park on the basis of his previous dealings at the venue.

■ Defendants contend that as a matter of law, plaintiff did not have a valid business relationship nor an expectancy with Delaware Park or any of the other named racing venues. In so arguing, defendants rely upon both the common law and Delaware Racing Rules which grant Delaware Park the exclusive right to exclude any person from its grounds without cause. Consequently, defendants contend that no action can lie against the non-Delaware Park defendants if the venue was under no obligation to grant plaintiff access. The defendants miss the point. Plaintiff's argument is that the defendants interfered with his business expectancy in racing at Delaware Park, by improperly

influencing Delaware Park's decision to not permit plaintiff to rent stalls or to race horses at the track. If true, that conduct is actionable under Delaware law and the existence of such a business expectancy is a question of fact not suitable for resolution at this time. It is axiomatic, however, that the tort of interference with an advantageous business relationship can only lie against a third-party to the business relationship.

■ Plaintiff also alleges that each of the defendants interfered with advantageous business relationships with respect to the racing venues at Philadelphia Park, Aqueduct, and Belmont. Plaintiff was denied stalls from each of these parks for their respective 2003 meets. Whether plaintiff had a valid business expectancy with respect to each of these venues is a question of fact not suitable to resolution at this time.

Consequently, to the extent that count III alleges that Delaware Park, LLC tortiously interfered with its own relationship with plaintiff, the action is dismissed.

### D. Defamation

■ Count IV of the complaint alleges that Abbey defamed plaintiff by calling him a "liar" in an article published in the Washington Post. Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury. *Read v. Carpenter,* 1995 WL 945544, at 2 (Del.Super.1995). Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Actual malice exists where the declarant acts with "knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*

■ Defendants allege that the complaint fails to state a claim of defamation because plaintiff is a public figure and because the complaint fails to allege malice. Whether plaintiff is a public figure is generally a question of fact, which is upon the defendant to prove. *See Gannett Co., Inc. v. Re.,* 496 A.2d 553 (Del.1985). In the present case, however, plaintiff has alleged that he is "the leading owner of thoroughbred racehorses in North America." (D.I.1, ¶ 30) The alleged defamation appeared in an article regarding plaintiff, written by a sportswriter about the sport of horse racing. As such, plaintiff is a sports figure and, thereby, a public figure for purposes of a defamation analysis. *See Re v. Gannett Co., Inc.,* 480 A.2d 662, 665 (Del.Super.1984).[3]

---

3. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (college football coach); *Silvester v. American Broadcasting Cos.,* 839 F.2d 1491 (11th Cir. 1988) (owner of jai alai fronton); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1280 (3d Cir.1979)(professional football player); *Time, Inc. v. Johnston,* 448 F.2d 378 (4th Cir.1971) (professional basketball player); *Cepeda v. Cowles Magazines,* 392 F.2d 417 (9th Cir.1968) (professional baseball player); *Holt v. Cox Enterprises,* 590 F.Supp. 408 (N.D.Ga.1984) (former college football star); *Barry v. Time, Inc.,* 584 F.Supp. 1110 (N.D.Cal.1984) (head college basketball coach); *Bell v. Associated Press,* 584 F.Supp. 128, 130–31 (D.D.C.1984) (professional football player); *Woy v. Turner,* 573 F.Supp. 35, 38 (N.D.Ga.1983) (agent for baseball player); *Milkovich v. Lorain Journal,* 65 Ohio App.2d 143, 416 N.E.2d 662 (1979), cert. denied, 449 U.S. 966, 101 S.Ct. 380, 66 L.Ed.2d 232 (1980) (high school wrestling coach); *Johnston v. Corinthian Television Corp.,* 583 P.2d 1101 (Okla.1978) (grade school wrestling coach); *Grayson v. Curtis Publishing Co.,* 72 Wash.2d 999, 436 P.2d 756 (1967) (college basketball coach).

■ Before considering whether the actual malice requirement in this case has been pled, Delaware law requires that the court first determines whether the "alleged defamatory statements are expressions of fact or protected expressions of opinion ... and whether the challenged statements are capable of a defamatory meaning." *Riley v. Moyed,* 529 A.2d 248, 251 (Del.1987) (footnote omitted). If the "court determines that the statements are protected expressions of opinion or that they are not capable of a defamatory meaning, it will not reach the actual malice issue or need to inquire into the defendant's state of mind." *Id.* (citing *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)). A pure statement of opinion is constitutionally protected and can not be a defamation as a matter of law. *See Riley v. Moyed,* 529 A.2d 248, 251 (Del.1987). Whether a statement constitutes opinion or factual representation is a question of law and is made from the position of an ordinary reader. *Id.*

In *Riley,* the Delaware Supreme Court applied a four factor test to determine whether a statement is one of fact or opinion. Those factors are: (1) consideration of the common usage or meaning of the challenged language; (2) ability to objectively verify the truth of the statement; (3) full context in which the statement was made; and (4) the broader social context into which the statement fits. *Id.* at 251–52.

■ In the present case, the alleged defamatory statement is that plaintiff is a "liar." Under the first factor, the term itself is certainly one which tends to disparage the plaintiff and, in certain circumstances, may be damaging to professional reputation. Under the second factor, however, the objective truth of the statement is less clear. The statement could have been interpreted to mean that plaintiff was lying in that particular case, or more generally, that plaintiff has the propensity to lie and was doing so in this particular case. The last two factors, the contextual considerations, weigh heavily toward the conclusion that the statement would be construed as mere opinion by the average reader and not actionable. In the exchange at issue, the plaintiff and defendant were clearly in a dispute over whether a particular conversation took place. The average reader, confronted with these statements, is more likely to view the term "liar" as an epithet, rather than a statement of fact. *Id.* at 253 (quoting *Okun v. Superior Court,* 29 Cal.3d 442, 175 Cal. Rptr. 157, 629 P.2d 1369, 1374 (1981) ("Where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.")).

In light of this analysis under *Riley,* the court concludes that defendant's statement in this context was one of opinion and, consequently, constitutionally protected and not actionable as defamation as a matter of law.

## V. CONCLUSION

For the reasons stated above, the court grants in part and denies in part defendants' motions to dismiss. An appropriate order consistent with this opinion shall issue.